IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

DEBORAH THORNTON,

    Plaintiff,

v.                                                    No. 05-2247 B

FEDERAL EXPRESS CORPORATION,
d/b/a FEDEX EXPRESS,

    Defendant.

---

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

---

The Plaintiff, Deborah Thornton, brought the instant action, alleging sex-based discrimination in violation of Title VII of the 1964 Civil Rights Act, disability discrimination in violation of the Americans with Disabilities Act ("ADA"), and retaliation. Before the Court is the July 14, 2006 motion of the Defendant, Federal Express Corporation ("Fed Ex"), for summary judgment. Thornton has responded, Fed Ex has replied, and this motion is now ripe for disposition. For the reasons set forth below, the motion for summary judgment is GRANTED.

BACKGROUND

For purposes of this motion, the following facts are undisputed unless noted. Fed Ex originally hired the Plaintiff, who is from Williston, Tennessee, in July 1995 to work at its "Memphis Hub." (Def.'s Statement of Undisputed Material Facts in Supp. Mot. Summ. J., ¶¶ 7, 9) ("Def.'s Statement of Facts"). Fed Ex has a policy of giving each employee a copy of its employee handbook, and Thornton received copies of the

1

handbook on three separate occasions during her employment with Fed Ex.  (Id., ¶¶ 1, 8). The handbook states that "the hours, shifts, and days of [an] employee's workweek [are] to remain flexible due to the nature of [Fed Ex's] business."  (Id., ¶ 2).  Employees whose jobs are part-time are guaranteed weekly pay for 17.5 hours even if they are scheduled for and work less than 17.5 hours in any given week.  (Id., ¶ 3).  Concerning sexual harassment in the workplace, the Defendant distributes to its employees its sexual harassment written policy which contains specific procedures for reporting and investigating allegations of sexual harassment.  (Id., ¶ 4).

Based upon the nature of its business, Fed Ex frequently reorganizes its "stations and courier routes to increase productivity and efficiency."  (Id., ¶ 9).  Because of this, the Plaintiff underwent changes in management, operations, and scheduling at various times during the term of her employment with Fed Ex.  This meant that Thornton often accepted whatever position was available, "including working the night shift or transferring to another station, in order to work closer to her home . . . ."  (Id.).

In early 2000, the Plaintiff "began working as a part-time Courier at FedEx's NQA Station in Cordova, Tennessee."  (Id., ¶ 10).  By June 2001, Thornton's job at the NQA station was to "run Route 267, a part-time route in a fast-growing rural area of West Tennessee," on Monday, Tuesday, and Wednesday; another courier drove the route on Thursday and Friday.  (Id., ¶ 11).  The Route 267 job allowed the Plaintiff to complete her daily duties between 1:00 to 2:00 p.m. except for "peak weeks" and "three days a month when couriers had to deliver 'bid packs' to FedEx pilots."  (Id.).  In July 2001, David Bragorgos became the manager for Monday, Tuesday, and Wednesday at the NQA station and to whom Thornton began reporting.  (Id., ¶ 12).

2

Although the parties dispute the exact timing, Plaintiff alleges Bragorgos began sexually harassing her soon after becoming her supervisor. (Id., ¶ 13). For example, Thornton claims that Bragorgos flirted with her, made references to her about his desire for sexual favors, made demands for sexual favors, touched her inappropriately, and asked to see her breasts and buttocks.[1] (Compl. 1-15). Thornton, however, did not report

---

[1] Specifically, Thornton alleges that

   a) Bragorgos spent a lot of time talking with Thornton and other employees while they worked at the conveyor belt during the morning Sort;
   b) Bragorgos "isolated" Thornton by moving her away from other employees on the conveyor belt during the morning "sort," telling other employees not to talk to her, or pulling her outside of others' listening range to speak to her;
   c) Bragorgos performed more "check rides" with Thornton that [sic] he did other employees in his workgroup, and he allegedly told another employee that he preferred to perform "check rides" with Thornton because she was "fun and easy to be around";
   d) After Thornton had lunch with Bragorgos at his house during a check ride, Bragorgos stated, "this wasn't so bad for a first date";
   e) When a co-worker commented to Thornton that "the talk now is that David is sleeping with you and not me," Bragorgos laughed in response and stated, "Let them think that if they want";
   f) Bragorgos made sexual jokes and comments around Thornton and other employees;
   g) Bragorgos told Thornton to tuck in her uniform shirt, but didn't tell other employees to tuck in their shirts;
   h) Bragorgos would often approach Thornton and whisper, "Have you got a present for Daddy, today?" while making eye contact with her breast and smiling;
   i) One day Bragorogs told Thornton that "all he wanted to do was take a peek at [her] breast;
   j) Bragorgos often discussed his relationship with his fiancée with Thornton, asked Thornton questions about her marriage, and asked her if she had ever cheated on her husband;
   k) During a check ride, Bragorgos directed Thornton to drive to a jewelry store, where he showed her a ring he planned to buy for his fiancée;
   l) Even though he knew that Thornton was never willing to work extra hours, Bragorgos "bullied" her by asking if she would work extra hours on her days off and then arguing with Thornton when she refused;

3

the alleged sexual harassment to anyone in management while she was working at the NQA station. (Def.'s Statement of Facts, ¶ 14).

In January 2003, Fed Ex informed its employees that it would be changing the NQA station's operations and altering routes based upon its closing the HKA station in Collierville, Tennessee. (Id., ¶ 15). Bragorgos and Stan Freeman, also a manager at the NQA station, worked for several weeks in conjunction with Fed Ex engineers and couriers "to redesign and restructure the courier routes that were operated by NQA Station." (Id., ¶ 16). As a result, Route 267 was eliminated. (Id., ¶17).[2] Thereafter,

---

> m) Bragorogs "humiliated" Thornton by yelling at her in front of other employees;
> n) On more than one occasion, Bragorgos asked Thornton, "when are we going to consummate our relationship?" and made the comment, "let's just get it over with and get the tension out of the air, you know we both want it";
> o) One morning in early to mid February 2003, Bragorgos brushed against Thornton's side as he passed and said, "you know what you can do if you want to keep your route";
> p) For a period of about two weeks, Bragorgos suggested several times that he and Thornton "should get together for a beer or something before he got married" and asked her when they could "get together";
> q) Bragorgos once referred to Thornton as a "tease";
> r) On three occasions, Thornton saw Bragorgos while she was driving her route and believed he was following her;
> s) On one occasion, Bragorgos "harassed" her by comparing her to a male courier during a discussion about her work performance; [and]
> t) After eliminating her route, Bragorgos failed to offer her a choice [of] temporary work assignments and changed her work schedule.

(Def.'s Statement of Facts ¶ 40).

[2] In her response to the Defendant's statement of facts concerning how and why Route 267 was changed, Thornton states, "Plaintiff disputes much of this paragraph, see route change vs. sexual harassment material disputed facts, supra." Thornton's response, however, fails to comply with the local rules of this district, which provide, in pertinent part,

> the opponent of a motion for summary judgment who disputes any of the material facts upon which the proponent

Bragorgos told the Plaintiff that she would be "assigned to deliver 'overflow' on Mondays, Tuesdays, and Wednesdays until the route changes at NQA had been completed, when she would be given another baseline route assignment." (Id.). Other couriers from the NQA station who lost their routes "were also given temporary assignments until restructuring ended and baseline routes became available." (Id., ¶ 18).

After Route 267 was eliminated, the Plaintiff's "pay rate remained the same and she worked an average of 23 hours a week."[3] (Id., ¶ 19). Eventually, Bragorgos assigned Thornton to Route 264 in Cordova, Tennessee on Wednesdays and told her that she would begin training on that route in order to ensure that she "was scheduled and paid for more than the guaranteed minimum number of hours for part-time employees." (Id., ¶ 20).

The Plaintiff spent three days training on Route 264 before deciding "that she did not want to run the route on Wednesdays because it required her to work later in the afternoon and prevented her from bringing her teenage son's guitar to his school for his

---

> has relied pursuant to subsection (2) above shall respond to the proponent's numbered designations, using the corresponding serial numbering, both in response and by affixing to the response copies of the precise portions of the record relied upon to evidence the opponent's contention that the proponent's designated material facts are at issue.

L.R. 7.2(d)(3), Local Rules of the U.S. Dist. Court for the W.D. Tenn. Thornton has failed to comply with the rule's mandate of "affixing to the response copies of the precise portions of the record relied upon . . . ." Therefore, the Court finds the facts in paragraph 17 are not in dispute for purposes of summary judgment.

[3] In the first week after the elimination of Route 267, Thornton only worked 14.5 hours but was paid the guaranteed minimum of 17.5 hours. (Def.'s Statement of Facts ¶ 19).

5

after-school band practice on Wednesday afternoons." (Id., ¶ 21).[4] Thornton and Bragorgos began arguing over her unwillingness to run Route 264 on Wednesday afternoons. (Id., ¶ 23). Thornton spoke to the "Human Resource Representative" and three other managers at the NQA station regarding "her unhappiness with her temporary work assignment," but she did not report being sexually harassed by Bragorgos. (Id., ¶ 24).

On April 7, 2003, Bragorgos gave the Plaintiff a choice of three temporary work assignments. (Id., ¶ 25). After choosing one of the options, Thornton told Bragorgos that she was planning on taking a personal leave of absence to "get [her] thoughts together" and "clear [her] head." (Id.). Thereafter, the Plaintiff applied for and was granted leave for "personal reasons." (Id., ¶¶ 26-28). Thornton then sought and was granted a thirty-day extension. (Id., ¶ 28).

In June 2003, the Plaintiff first reported to Fed Ex that she had been sexually harassed. (Id., ¶ 29). After that time, she submitted a formal complaint alleging that Bragorgos had sexually harassed her while she worked for him at the NQA station. (Id.).

The Defendant initiated an investigation that was comprised of interviews with Bragorgos and five other witnesses named in the Plaintiff's complaint and research of internal company records relevant to some of Thornton's claims. (Id., ¶ 30). The investigators concluded that the Plaintiff's claims "could not be confirmed," resulting in the investigation being closed on July 31, 2003. (Id., ¶ 31).

---

[4] In her response to paragraph 21, Thornton states, "Plaintiff was unable to talk with Bragorgos about the Wednesday matter as he was on vacation during the first week of training of Route 264. (See ¶ 20, supra.)." (Pl.'s Resp. in Opposition to Def.'s Statement of Undisputed Material Facts ¶ 21). Once again, the Court finds that the Plaintiff has failed to comply with the requirements of Local Rule 7.2 and thus, paragraph 21 is deemed admitted.

6

After the expiration of her personal leave, Fed Ex "attempted to return Thornton to work at NQA Station under the management of Marc Morris . . . in a part-time 'First Overnight' assignment that would allow her to leave work at her preferred time on weekday afternoons." (Id., ¶ 32). The Plaintiff, however, told Morris that she was unable to return due to "medical reasons," but Morris told her that she would need to "provide medical documentation" to support her continued leave. (Id.).

Eventually, Thornton provided Fed Ex with documentation from her psychiatrist and psychologist stating that she was unable to perform her job because of "severe work-related stress," resulting in the Defendant placing her "on a worker's compensation medical leave of absence." (Id., ¶ 33). During the time of her leave, however, the Plaintiff refused to allow her treating physicians to release her medical information to Fed Ex's "third-party workers' compensation administrator"[5] which resulted in the administrator denying Thornton's worker's compensation benefits in June 2004. (Id., ¶ 34). The Defendant then notified the Plaintiff that her medical leave would expire on July 13, 2004, and that she "would be terminated if she did not secure another position with FedEx by that date." (Id., ¶ 35). Fed Ex ultimately ceased Thornton's employment on August 24, 2004. (Id., ¶ 37).

The Plaintiff filed her first charge of discrimination with the EEOC on December 3, 2003, while she was on medical leave. (Id., ¶ 38). She presented other charges of

---

[5] In response to this statement of undisputed fact by Fed Ex, Thornton states, "[o]ver the next several months, Thornton provided FedEx and the insurance carrier medical information supporting her leave and despite this her worker's compensation leave was denied." (Pl.'s Resp. in Opposition to Def.'s Statement of Undisputed Material Facts ¶ 34). Once again, the Court finds that the Plaintiff has failed to comply with the requirements of Local Rule 7.2 and paragraph 34 is deemed admitted. In any event, the Court does not find this fact to be material.

7

discrimination, including disability and retaliation, with the EEOC on September 16, 2004. (Id.).

## STANDARD OF REVIEW

Rule 56(c) provides that a

> judgment . . . shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986); Canderm Pharmacal, Ltd. v. Elder Pharms., Inc., 862 F.2d 597, 601 (6th Cir.1988). In reviewing a motion for summary judgment, the evidence must be viewed in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986). When the motion is supported by documentary proof such as depositions and affidavits, the nonmoving party may not rest on his pleadings but, rather, must present some "specific facts showing that there is a genuine issue for trial." Celotex, 477 U.S. at 324, 106 S. Ct. at 2552. It is not sufficient "simply [to] show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., 475 U.S. at 586, 106 S. Ct. at 1356. These facts must be more than a scintilla of evidence and must meet the standard of whether a reasonable juror could find by a preponderance of the evidence that the nonmoving party is entitled to a verdict. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S. Ct. 2505, 2512 (1986). Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322, 106 S.

Ct. at 2552. In this circuit, "this requires the nonmoving party to 'put up or shut up' [on] the critical issues of [his] asserted causes of action." Lord v. Saratoga Capital, Inc., 920 F. Supp. 840, 847 (W.D. Tenn. 1995) (citing Street v. J.C. Bradford & Co., 886 F.2d 1472, 1478 (6th Cir.1989)). Finally, the "judge may not make credibility determinations or weigh the evidence." Adams v. Metiva, 31 F.3d 375, 379 (6th Cir. 1994).

## ANALYSIS

Fed Ex contends that it is entitled to summary judgment because Thornton's claims are untimely, the Plaintiff cannot prove discrimination based on sex or disability, and she cannot establish retaliation.

I. UNTIMELY CLAIMS

Fed Ex initially argues that the Plaintiff's claims which preceded her filing of a complaint with the Equal Employment Opportunity Commission ("EEOC") by 180 days or more are untimely. Specifically, the Defendant asserts that "any claim related to events that occurred before June 5, 2003 should be dismissed" as untimely. The Plaintiff contends that the pattern of events was "ongoing," thereby precluding dismissal as untimely.

Where, as here, a Title VII plaintiff first initiates proceedings with the EEOC, only those discriminatory acts by the Defendant that occurred within 180 days before the date of filing are actionable. 42 U.S.C. § 2000e-5(e)(1); see also Nichols v. Muskingum College, 318 F.3d 674, 677-78 (6th Cir. 2003). Thornton maintains, however, that acts outside the 180 day time limit should also be considered because they are part of a continuing hostile work environment in violation of her Title VII rights. (Pl.'s Resp. at 22-23). A hostile work environment exists where "the workplace is permeated with

9

discriminatory intimidation, ridicule, and insult . . . that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment . . . ." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21, 114 S. Ct. 367, 370 (1993) (internal quotations and citations omitted). In National Railroad Passenger Corp. v. Morgan, the United States Supreme Court recognized the difference between claims based on discrete discriminatory acts and those representing a hostile work environment. 536 U.S. 101, 122 S. Ct. 2061 (2002). "Hostile work environment claims are different in kind from discrete acts" because the "very nature" of a hostile work environment "involves repeated conduct." Id. at 115, 122 S. Ct. at 2073. In contrast to discrete acts, the unlawful employment practice comprising a hostile work environment claim "occurs over a series of days or perhaps years and . . . a single act of harassment may not be actionable on its own." Id. Accordingly, the Supreme Court concluded that so long as "an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." Id. at 117, 122 S. Ct. at 2074.  The Court finds that the Plaintiff's allegations concerning hostile work environment are not untimely as she has alleged an ongoing pattern of harassment within the ambit of Morgan.  However, concerning Thornton's claim for quid pro quo sexual harassment, the Court will consider only those events occurring 180 days prior to the filing of the EEOC charge.

II.     QUID PRO QUO SEXUAL HARASSMENT

The Defendant contends that Thornton's allegations concerning Bragorgos do not as a matter of law constitute an actionable case of quid pro quo sexual harassment. The Sixth Circuit has recognized that Title VII affords relief for "(1) quid pro quo sexual

10

harassment; and (2) sexual harassment which results from a hostile or offensive work environment." Highlander v. KFC Nat. Mgmt. Co., 805 F.2d 644, 648 (6th Cir. 1986) (emphasis deleted) (citing Rabidue v. Osceola Refining Co., 805 F.2d 611, 618-619 (6th Cir. 1986)).

> Quid pro quo sexual harassment is anchored in an employer's sexually discriminatory behavior which compels an employee to elect between acceding to sexual demands and forfeiting job benefits, continued employment or promotion, or otherwise suffering tangible job detriments. In a quid pro quo action, the employee bears the burden of proof to support charges that submission to the unwelcomed sexual advances of supervisory personnel was an express or implied condition for receiving job benefits or that a tangible job detriment resulted from the employer's failure to submit to the sexual demands of supervisory employees.

Id. (emphasis deleted).

In order to prevail on a claim of quid pro quo sexual harassment, a Title VII plaintiff must show

> (1) that the employee was a member of a protected class; (2) that the employee was subjected to unwelcomed sexual harassment in the form of sexual advances or requests for sexual favors; (3) that the harassment complained of was based on sex; (4) that the employee's submission to the unwelcomed advances was an express or implied condition for receiving job benefits or that the employee's refusal to submit to a supervisor's sexual demands resulted in a tangible job detriment; and (5) the existence of respondeat superior liability.

Id. (citing Downes v. FAA, 775 F.2d 288, 291-92 (Fed. Cir. 1985), and Henson v. City of Dundee, 682 F.2d 897, 909 (11th Cir. 1982)).

In this case, Fed Ex claims the plaintiff has failed to demonstrate that she suffered a tangible job detriment. In Burlington Indus., Inc. v. Ellerth, the Supreme Court

11

explained that "[a] tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." 524 U.S. 742, 761, 118 S. Ct. 2257, 2268-69 (1998) (comparing Crady v. Liberty Nat. Bank & Trust Co. of Ind., 993 F.2d 132, 136 (7th Cir. 1993) ("A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation"), with Kocsis v. Multi-Care Mgmt., Inc., 97 F.3d 876, 887 (6th Cir. 1996) (demotion without change in pay, benefits, duties, or prestige insufficient); Harlston v. McDonnell Douglas Corp., 37 F.3d 379, 382 (8th Cir. 1994) (reassignment to more inconvenient job insufficient); Flaherty v. Gas Research Inst., 31 F.3d 451, 456 (7th Cir. 1994) (a "bruised ego" is not enough)).

In this case, the undisputed facts demonstrate that Thornton was neither fired nor demoted.[6] Rather, her normal route was changed, resulting in her having to work Wednesdays, a day she preferred not to work. However, the Supreme Court cited Harlston for the proposition that a "reassignment to [a] more inconvenient job [is] insufficient" to establish a claim for quid pro quo sexual harassment. This Court concludes the Plaintiff has failed to demonstrate a tangible job detriment as defined in Ellerth, and therefore, the Defendant's motion for summary judgment on the claim of quid pro quo sexual harassment is GRANTED.

---

[6] Although the Plaintiff was eventually terminated, her termination occurred after she had been on disability leave for a period of one year.

III.     HOSTILE WORK ENVIRONMENT

Fed Ex next contends that Thornton's allegations concerning Bragorgos do not constitute an actionable hostile work environment.  Harassment is also actionable under Title VII where "the workplace is permeated with discriminatory intimidation, ridicule, and insult . . . that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment . . . ." Harris, 510 U.S. at 21, 114 S. Ct. 367 (1993) (internal quotations and citations omitted).

To prevail on a claim for hostile work environment, a plaintiff must establish that "(1) she was a member of a protected group, (2) she was subjected to unwelcome harassment, (3) the harassment was based upon the employee's protected status, such as race or gender, (4) the harassment affected a term, condition, or privilege of employment, and (5) the defendant knew or should have known about the harassing conduct but failed to take any corrective or preventive actions."  Howard v. Bd. of Educ. of Memphis City Schools, 70 Fed. Appx. 272, 281 (6th Cir. 2003) (citing Williams v. Gen. Motors Corp., 187 F.3d 553, 560-61 (6th Cir. 1999)); see also Lavack v. Owen's World Wide Enter. Network, Inc., 409 F. Supp. 2d 848, 854 (E.D. Mich. 2005) (applying prima facie case for Title VII hostile work environment to a same-sex sexual harassment action).

Fed Ex claims the Plaintiff's allegations are neither severe nor pervasive enough to have altered the terms of her employment.  The Supreme Court applies a totality of the circumstances approach to determine whether a hostile work environment claim is actionable considering: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  Faragher v.

City of Boca Raton, 524 U.S. 775, 787-88, 118 S. Ct. 2275, 2283 (1998) (quoting Harris, 510 U.S. at 23, 114 S. Ct. at 371) (internal quotations omitted).  The "conduct must be extreme to amount to a change in the terms and conditions of employment." Id. at 788. In other words, the harassment must have "adversely affected the employee's ability to do his or her job." Moore v. KUKA Welding Sys. & Robot Corp., 171 F.3d 1073, 1079 (6th Cir. 1999). "'[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment.'"  Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 271, 121 S. Ct. 1508, 1510 (2001) (quoting Faragher, 524 U.S. at 788, 118 S. Ct. at 2283).

The Court finds that the allegations of sexual harassment alleged by Thornton to have been committed by Bragorgos, see supra at 3 n.1, did not operate so as to permeate Fed Ex's NQA station with "discriminatory intimidation, ridicule, and insult" sufficient to have altered the conditions of the Plaintiff's employment.  Rather, Bragorgos' actions as alleged by Thornton are more closely in accord with the "simple teasing, offhand comments, and isolated incidents" which the Supreme Court stated would "not amount to discriminatory changes in the terms and conditions of employment." Faragher, 524 U.S. at 787-88, 118 S. Ct. 2283.  As a result, the Court concludes that the Plaintiff has failed to establish that the Defendant created a hostile work environment.

IV.     DISABILITY DISCRIMINATION

The Defendant next contends that it is entitled to judgment as a matter of law on Thornton's claim under the Americans with Disabilities Act ("ADA").  The ADA prohibits covered entities, including private employers like FedEx, from discriminating against "a qualified individual with a disability because of the disability of such

14

individual." 42 U.S.C. § 12112(a); Sutton v. United Airlines, Inc., 527 U.S. 471, 477-78, 119 S.Ct. 2139, 2144, 144 L.Ed.2d 450 (1999). "Unlawful discrimination includes firing an individual because of [her] disability." Moorer v. Baptist Mem'l Health Care Sys., 398 F.3d 469, 479 (6th Cir. 2005), reh'g en banc denied, (Apr. 15, 2005) (citing 42 U.S.C. § 12112(a)). "The prima facie case of disability discrimination requires the plaintiff to prove that: (1) [she] is an individual with a disability; (2) [she] is 'otherwise qualified' to perform the job requirements, with or without reasonable accommodations; and (3) [she] was discharged solely by reason of [her] handicap." Williams v. London Util. Comm'n, 375 F.3d 424, 428 (6th Cir. 2004) (citations and internal quotation marks omitted). "If the plaintiff can prove a prima facie case, then the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the termination. Then, the burden shifts back to the plaintiff to prove that the stated reasons are pretext." Id. However, the ultimate burden of proof remains at all times with the plaintiff. Brenneman v. MedCentral Health Sys., 366 F.3d 412, 418 (6th Cir. 2004), cert. denied, 543 U.S. 1146, 125 S. Ct. 1300 (2005).

      Fed ex asserts that Thornton has failed to demonstrate that she is disabled under the ADA. An ADA plaintiff may prove discrimination based upon her disability either through direct or indirect evidence. Hedrick v. Western Reserve Care Sys., 355 F.3d 444, 452 (6th Cir. 2004), cert. denied, 543 U.S. 817, 125 S. Ct. 68 (2004). Both require the plaintiff to show she is disabled. Id. at 452-53. Under the statute, the term "disability" is defined as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2); Toyota Motor

Mfg., Ky., Inc. v. Williams, 534 U.S. 184, 193, 122 S. Ct. 681, 689 (2002). In Sutton, the Supreme Court cautioned that a disability "exists only where an impairment 'substantially limits' a major life activity, not where it 'might,' 'could,' or 'would' be substantially limiting if mitigating measures were not taken." Sutton, 527 U.S. at 482, 119 S. Ct. at 2146. Whether a plaintiff has a disability as defined by the ADA is an individualized inquiry. Id. at 483, 119 S. Ct. at 2147. An individual must "offer evidence that the extent of the limitation caused by [her] impairment in terms of [her] own experience is substantial." Toyota Motor Mfg., 534 U.S. at 185, 122 S. Ct. at 685. In Toyota Motor Manufacturing, the Supreme Court instructed that the standard for qualifying as "disabled" under the ADA was a demanding one to be interpreted strictly. Id. at 197, 122 S. Ct. at 691.

The Court finds that the Plaintiff has failed in her burden to prove she is disabled within the meaning of the statute. Although Thornton claims that she "has been found by the Social Security Administration to be physically and mentally impaired," such self-serving statements do not constitute evidence nor comport with the local rules of this district. See L.R. 7.2. Moreover, there is no evidence in this record that the Plaintiff was discharged only because of her alleged handicap. Therefore, the Defendant's motion for summary judgment on the issue of disability discrimination is GRANTED.

V.   RETALIATION

The Defendant next contends it is entitled to judgment on the Plaintiff's retaliation claim. Thornton has asserted retaliation claims under Title VII and the ADA in which she claims she was retaliated against because of her filing complaints with the EEOC.

16

To establish a prima facie case of retaliation, a plaintiff must show that "(1) [s]he engaged in a protected activity; (2) [her] engagement in that protected activity was known to [her] employer; (3) [her] employer, thereafter, took an action that a reasonable employee would have found to be materially adverse; and (4) a causal link exists between [her] engagement in the protected activity and the adverse action." Morgan v. Masterfoods USA, Inc., No. 2:04-CV-907, 2006 WL 3331780, at *8-9 (S.D. Ohio Nov. 14, 2006). In its motion, Fed Ex claims no causal link exists between Thornton's EEOC filings and her later termination.

The causal link requirement "may be demonstrated by the proximity of the adverse action to the protected activity." Wrenn v. Gould, 808 F.2d 493, 501 (6th Cir. 1987). In order

> to establish the element of causal link a plaintiff is required to proffer evidence sufficient to raise the inference that her protected activity was the likely reason for the adverse action. Accordingly, at the prima facie stage the burden is minimal, requiring the plaintiff to put forth some evidence to deduce a causal connection between the retaliatory action and the protected activity and requiring the court to draw reasonable inferences from that evidence, providing it is credible.

Nguyen v. City of Cleveland, 229 F.3d 559, 566 (6th Cir. 2000). Sixth Circuit precedent stands for the proposition that where the temporal proximity is more remote, the plaintiff must adduce additional facts from which the court may draw a reasonable inference of the causal connection. See, e.g., Harrison v. Metro. Gov't of Nashville, 80 F.3d 1107, 1119 (6th Cir. 1996). In this case, the Plaintiff filed a formal complaint with the EEOC in June 2003 but was not terminated until August 2004. The Court finds the temporal proximity between the protected activity and the alleged retaliation is remote. Moreover,

17

the only evidence presented by the Plaintiff to support her retaliation claim is her own accusation of a causal connection. She has failed to adduce additional facts from which this Court may draw a reasonable inference of a causal connection. The Court finds the Plaintiff's accusation insufficient to withstand a motion for summary judgment. Therefore, Fed Ex's motion for summary judgment on the issue of retaliation is GRANTED.

VI.     STATE LAW CLAIMS

Having disposed of the Plaintiff's claims under federal law, the Court now turns to Thornton's state law claims against Fed Ex. The exercise by a district court of supplemental, or pendent, jurisdiction over state law claims is governed by title 28 section 1367 of the United States Code, which expressly permits the Court to decline the exercise of jurisdiction when it has dismissed all claims over which it has original jurisdiction. See 28 U.S.C. § 1367(c)(3). Absent any remaining federal claims against Fed Ex, the Court, in its sound discretion, hereby dismisses without prejudice the Plaintiff's claims against this Defendant under state law. See Weeks v. Portage County Executive Offices, 235 F.3d 275, 279-80 (6th Cir. 2000) (stating that a district court's decision to decline to exercise supplemental jurisdiction lies within its sound discretion).

## CONCLUSION

Based on the foregoing, the Defendant's motion for summary judgment on the Plaintiff's Title VII, ADA, and retaliation claims is GRANTED. Furthermore, in the Court's discretion, the Plaintiff's remaining state law claims against this Defendant are DISMISSED without prejudice.

IT IS SO ORDERED this 22nd day of January, 2007.

                                        s/ J. DANIEL BREEN
                                        UNITED STATES DISTRICT JUDGE